306 F.2d 144
 Ruth A. MOREWITZ, Administratrix of the Estate of George Vokorokos, Deceased, Appellant and Cross-Appellee,
v.
Panamanian S.S. MATADOR, and A. Vlasto, Phocean Ship Agency, Ltd., Appellees, and
Motor Shipping Corporation of the Seven Seas, Appellee and Cross-Appellant.
 No. 8567.
 United States Court of Appeals Fourth Circuit.
 Argued April 6, 1962.
 Decided June 28, 1962.
 
 Burt M. Morewitz, Newport News, Va., for appellant and cross-appellee.
 Walter B. Martin, Jr., Norfolk, Va. (Vandeventer, Black, Meredith & Martin, Norfolk, Va., on brief), for appellees and appellee and cross-appellant.
 Before SOBELOFF, Chief Judge, and SOPER and BELL, Circuit Judges.
 J. SPENCER BELL, Circuit Judge.
 
 
 1
 This is an appeal by the libellant George Vokorokos and a cross-appeal by the S/S Matador and Motor Shipping Corporation of the Seven Seas, her owner, from a decree of the United States District Court in Admiralty. The libel set forth four causes: the first and second, respectively, were for wages due and penalty for withholding; the third sounded in damages for failure to provide adequate medical care; and the fourth was for maintenance, cure, and wages until recovery.
 
 
 2
 The Court dismissed the third and fourth causes with prejudice; awarded the seaman $142.80 wages for the six weeks period of hospitalization at Norfolk, and liquidated damages of $142.80 under 46 U.S.C.A. §§ 596-597 with costs.
 
 
 3
 The libellant, a sixty-two year old Greek seaman, signed Articles in Hamburg to serve as fireman aboard the S/S Matador, of Panamanian registry. Before being hired, he underwent a medical examination and was "passed by a doctor as healthy and fit for sea duty".
 
 
 4
 He served on the vessel from August 22nd until September 19, 1956, during which time the vessel made the voyage from Hamburg to Hampton Roads, reaching port on the 18th. On September 19th he was admitted to the United States Public Health Service Hospital in Norfolk, Virginia. The hospital record indicated a history of dyspnea (shortness of breath) and orthopnea (difficulty of breathing) when first lying down. The diagnosis was:
 
 
 5
 "1. Acute myocardial infarction due to arteriosclerotic coronary thrombosis.
 
 
 6
 "2. Arteriosclerotic heart disease.
 
 
 7
 "3. Cardiac insufficiency.
 
 
 8
 "4. Dilatation of ascending aorta."
 
 
 9
 In his deposition, given before trial, the seaman testified that his symptoms began about four days before he entered the hospital. The hospital record indicated that the seaman at one time stated that his difficulties had existed for about ten days and at another time for about twenty days. However, the hospital record also indicates that the patient had difficulty with the English language, which might explain the discrepancy, if indeed the discrepancy is as important as Proctors for the Respondents seemed to think. Regardless of which version of this testimony is accepted, its only relevancy to the issue is to show that the illness occurred at some time within the twenty-eight day period of libellant's employment. We do not think, in view of this, that the discrepancy can be regarded as substantially weakening libellant's credibility in view of all the surrounding circumstances, since it cannot by any stretch of the imagination amount in itself to a showing that the condition preexisted employment.
 
 
 10
 The record contains three electrocardiograms taken at the hospital which confirmed the above diagnosis. The one dated September 20th read, "Antero-Septal infarction of indeterminate age probably recent". The one dated September 24th read, "Anterolateral Myocardial infarct, undetermined age but appears recent". The third, dated on October 23rd, read, "Anterolateral myocardial infarction of indeterminate age". The narrative summary of treatment contains the following: "Because of the probability that his infarction was of recent origin, he was started on anticoagulants". The final entries on the patient's progress record read, "* * * E K G showed anterolateral myocardial infarction that appeared recent. Patient was digitalized and given Mercury diuretics with good results. Is now waiting for ship to Greece with M. D. Is off anticoagulents and ready to go with ship. Should be discharged N.F.F.D. [not fit for duty] on digitalis. Could use another shot of Merc. just prior to discharge". Upon discharge on November 2, 1956, the record showed that his condition had "improved" in respect to his heart attack and his congestive heart failure, but was unimproved in respect to his arteriosclerotic heart disease and dilatation of ascending aorta.
 
 
 11
 It appears from affidavits in the record that the seaman arrived in Greece where he was treated by a Dr. Demetrios from November 25, 1956, until July 30, 1958. This affidavit stated that on his arrival his condition was so serious and critical that he was confined to his bed. Dr. Bilisoly, a medical expert for the respondents, examining an electrocardiogram made in Greece dated March 10, 1957, testified: "He has shown, in the course of the interval [between his final E K G at Norfolk hospital on October 23, 1956, and that of March 10, 1957] the usual changes of return toward normal in the form of the electrocardiogram which is referred to as the evolution of the heart attack, or the area of infarction has gone on towards adequate healing without evidence of further damage". (Emphasis added).
 
 
 12
 Upon examination of the cardiograms taken in August of 1957 and August of 1958 he stated that they showed essentially no change from the March 1957 cardiogram. This same expert testified on direct that as far as "actual" (active) treatment was concerned the seaman had reached a relatively stable state in his course following the heart attack — that to judge from the cardiograms, the area of the heart muscle had progressed safely, healing by scarring, and that from the medical point of view he had reached near maximum recovery from his heart attack and from his congestive heart failure at the time of his discharge from the Marine Hospital on November 2, 1956.
 
 
 13
 Upon this evidence the District Court found that the seaman had reached a "relative stable condition and was near maximum recovery when he was discharged from the hospital" on November 2, 1956. The Court drew the conclusion from the evidence that the libellant was not entitled to maintenance, cure, or wages after November 2, 1956. The test is not whether the seaman has reached near maximum recovery but whether he has reached maximum recovery. (Muruaga v. United States, 172 F.2d 318 (2 Cir., 1949)). In the Muruaga case the Court dealt with the same situation we face here. There the District Court, "* * * (D)id not, however, find the date when the appellant's condition had improved, or would be improved, to the maximum to be expected from treatment". At 320. In reversing for a new trial the Court said that the shipowner's liability for maintenance and cure:
 
 
 14
 "* * * (D)oes not necessarily end when the voyage is ended, it is discharged when the shipowner has provided actual maintenance and cure, or its equivalent in money, up to the time when the seaman has recovered from his disability to the extent it is reasonable to believe recovery under treatment is possible. Lindgren v. Shepard S.S. Co., 2 Cir., 108 F.2d 806. What that date may be in any particular case is what the competent evidence may show it to be. * * * Each case is to be decided on its own established facts. * * * As we cannot tell from this record when, if ever, the appellant did reach the point of maximum improvement in his incurable condition the decree must be reversed for a finding as to that and for a decree giving due effect to it." At 320-321.
 
 
 15
 We cannot find that the opinion of the Respondents' expert is in fact in conflict with the evidence which the record contains concerning further progress towards normalcy at least for the period between departure from the hospital in Norfolk and the March 1957 cardiograms. There is no evidence in the Court's findings that it rejected the affidavits from the doctors in Greece or those aspects of the hospital medical records which indicated further time would be needed for the recuperative process after the seaman left Norfolk, i. e., that he was not fit for duty indefinitely; that he was to continue on digitalis, and that he must travel on a ship where he could obtain the services of a doctor.
 
 
 16
 Even assuming that the heart had reached a relatively stable condition on November 2, 1956, the doctor's testimony that the cardiogram of March 1957 showed progress over that of October 1956 was uncontroverted evidence that the patient had not reached maximum recovery on the former date. We think it also pertinent that the seaman was discharged as not fit for duty indefinitely instead of not fit for duty permanently, for this would seem to indicate that at that stage the patient was still progressing so that it was not possible to make a final prognosis. From the undisputed evidence in the record as a whole we think it clear that the libellant has shown that he had not reached maximum recovery until the date of the cardiogram taken on March 10, 1957.
 
 
 17
 The appellant also contends that he is entitled to compensation for total and permanent disability under the Panamanian Labor Code. The Court found that the libellant was not afflicted with an occupational disease within the meaning of the Panamanian law. However, the Code provides that if an occupational injury is aggravated by subsequent work it is compensable. Fatal to this claim of the appellant, however, is the Court's finding that there was no showing in the record that the libellant's activities during or subsequent to the attack had aggravated his condition or retarded his recovery.
 
 
 18
 Proctors for the appellee seek reversal on his cross-appeal of that part of the decree awarding wages and a penalty for the period of hospitalization of libellant on the grounds that the Labor Code of Panama — § 74 and § 75(5) — apply. We think it clear that these sections do not apply to the claim of a seaman for maintenance and cure and wages until he has reached maximum recovery. These sections are directly and irreconcilably in conflict with § 134 of Part XII, "Employment at sea and on navigable waterways" of the Labor Code of Panama. Section 134 provides,
 
 
 19
 "If a seaman contracts any sickness in the course of a voyage and such sickness is not due to any fault on his part, he shall be entitled to be cared for at the expense of the employer, whether on board the vessel or ashore, and to the payment of his wages * * *." (Emphasis added).
 
 
 20
 Whatever rights may be given the employers generally by § 74 and § 75, it is clear that seamen are specifically given a right to be paid their wages while recuperating from "any sickness" contracted "in the course of a voyage". There is nothing in either § 74 or § 75, or in both when read together, showing an intent to abrogate this right. Any such construction would do manifest violence to § 134. Therefore, appellee's contentions on the cross-appeal are without merit.
 
 
 21
 We, therefore, return the case to the District Court in order that a decree may be entered allowing maintenance, cure and wages until March 10, 1957, the date upon which this record indicates that the libellant had reached maximum recovery.
 
 
 22
 Remanded.